**WISCONSIN EDUCATION ASSOCIATION COUNCIL; Wisconsin Council Of County And Municipal Employees, AFSCME, District Council 40, AFL–CIO; Wisconsin State Employees Union, AFSCME, District Council 24, AFL–CIO; AFT–Wisconsin, AFL–CIO; AFSCME, District Council 48, AFL–CIO; Seiu Healthcare Wisconsin, CTW, CLC; and Wisconsin State AFL–CIO, Plaintiffs,**

v.

**Scott WALKER, Governor, State of Wisconsin; Michael Huebsch, Secretary, Department of Administration; Gregory L. Gracz, Director, Office of State Employment Relations; James R. Scott, Chair, Wisconsin Employment Relations Commission; Judith Neumann, Commissioner, Wisconsin Employment Relations Commission; and Rodney G. Pasch, Commissioner, Wisconsin Employment Relations Commission, Defendants.**

No. 11–cv–428–wmc.

United States District Court, W.D. Wisconsin.

March 30, 2012.

Aaron N. Halstead, Hawks Quindel Ehlke & Perry, S.C., Peggy A. Lautenschlager, Lawton & Cates, S.C., Kurt C. Kobelt, Wisconsin Education Association Council, Madison, WI, Barbara Zack Quindel, Timothy E. Hawks, Hawks Quindel, S.C., Marianne Goldstein Robbins, Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, S.C., Milwaukee, WI, Jason Walta, National Education Association, Jeremiah Collins, John West, Leon Dayan, Bredhoff & Kaiser, P.L.L.C., Washington, DC, Mark A. Sweet, Law Offices of Mark A. Sweet, LLC, Whitefish Bay, WI, for Plaintiffs.

Eric M. McLeod, Michael P. Screnock, Michael Best & Friedrich LLP, Steven

Carl Kilpatrick, Wisconsin Department of Justice, Madison, WI, Joseph Louis Olson, Michael Best & Friedrich LLP, Milwaukee, WI, for Defendants.

## OPINION AND ORDER

WILLIAM M. CONLEY, District Judge.

With the passage of 2011 Wisconsin Act 10, denominated the "Budget Repair Bill," the State of Wisconsin took a sweeping right turn from a half century of developments in the rights of its public employees to unionize, collectively bargain and collect union dues.[1] Plaintiffs, representing seven of Wisconsin's largest public unions, do not challenge this exercise of political will by the Legislature or Governor, apparently acknowledging that the wisdom of this change is for the court of public opinion—a forum where heated discourse and recall elections continue.[2] Instead, on Equal Protection and First Amendment grounds, plaintiffs challenge the law's creation and treatment of two new classifications of public employees: "general" and "public safety."

Under Act 10, the State left the rights of public safety employees to unionize and collectively bargain unchanged, while general employees lost most of these rights. Here, plaintiffs challenge three, specific provisions of Act 10 impacting only general employees and their unions: (1) the elimination of mandatory dues and fair share fees and the stripping of all collective bargaining rights, except on "total base wages"; (2) the apparently-unprecedented requirement for annual recertification by an absolute majority of union members (as opposed to conditional or member-driven recertification by a simple majority of those actually voting); and (3) a prohibition on the voluntary withholding of union dues from a general employee's paycheck.

Now before the court is plaintiffs' motion for summary judgment and defendants' motion for judgment on the pleadings.[3] (Dkt. ## 75, 88.) Relying principally on the modest protections afforded by the Equal Protection Clause, plaintiffs argue no rational basis exists for the general and public safety classifications, other than the award of naked political patronage—the primary beneficiaries of the "public safety" classification being unions who publicly and monetarily supported Governor Walker's November 2010 election. Defendants, on the other hand, contend that the

1. In 1959, Wisconsin became the first state to recognize the right of public employees to collectively bargain. *See* Municipal Employment Relations Act, Wis. Stat. § 111.70 (enacted in 1959); Joseph E. Slater, *Lessons from the Public Sector: Suggestions and a Caution,* 94 MARQ. L.REV. 917, 927 n.65 (2011) (discussing public union history).

2. Seventh Circuit Judge Diane Sykes recently provided background for those interested in some of the political machinations since the election of Governor Walker and a majority of his party to both houses of the Wisconsin Legislature. *See Wis. Right to Life State Political Action Comm. v. Barland,* 664 F.3d 139, 144–45 (7th Cir.2011).

3. On behalf of their general employee union members, plaintiffs originally sought a tempo-

rary restraining order or preliminary injunction enjoining the enforcement of these three provisions. Failing to perceive a basis for the sweeping interim relief sought, the court has been dilatory in ruling on those motions. This was by no means a conscious decision by the court to frustrate the rights of plaintiffs to a ruling or opportunity for an interlocutory appeal of that ruling, though it obviously had that effect, but rather a combination of the weighing of the uncertainties of ruling on a shifting and incomplete record against the press of other business and, ultimately, the need for further consideration of the First Amendment aspects of plaintiffs' claims. Nor is it reflective of the court's past or future practice, except perhaps those in the unusual posture of this case, and preferably not even then.

creation of a new class of public safety unions and exempting those unions and their members from extensive changes in the rights of Wisconsin's other public employee unions and their members is rationally related to the legitimate government interest of "prevent[ing] the disruption of essential government services." (Defs.' TRO Opp'n (dkt. # 40) 8.)

The sole issue before the court, therefore, is whether the State's dismantling of public union rights in piecemeal fashion implicates constitutional protections. Plaintiffs assert two causes of action: (1) an Equal Protection claim as to all three challenged provisions in Act 10; and (2) a First Amendment claim as to the prohibition on automatic dues withholding for members of general employee unions.

The court finds that plaintiffs have not met their burden with respect to their Equal Protection challenge to Act 10's principal provisions limiting the collective bargaining rights of general employees and their unions. The State, however, has not articulated, and the court is now satisfied cannot articulate, a rational basis for picking and choosing from among public unions, those (1) that must annually obtain an absolute majority of its voluntary members to remain in existence or (2) that are entitled to voluntary, assistance with fundraising by automatic deduction, at least not a rational basis that does not offend the First Amendment. So long as the State of Wisconsin continues to afford ordinary certification and dues deductions to mandatory public safety unions with sweeping bargaining rights, there is no rational basis to deny those rights to voluntary general unions with severely restricted bargaining rights.

Accordingly, the court will (1) grant defendants judgment on those claims challenging restrictions on the collective bargaining rights of general employee unions

on Equal Protection grounds, (2) grant plaintiffs summary judgment on their claims challenging annual, absolute majority union recertification and denial of voluntary union dues deductions as to general employee unions on Equal Protection and First Amendment grounds, and (3) enter the appropriate relief.

## PRELIMINARY MATTERS

In addition to the pending dispositive motions, there are a number of other, related motions presently before the court. *First*, there are separate motions to intervene. Kristi LaCroix, Nathan Berish and Ricardo Cruz have moved to intervene as defendants in this action pursuant to Federal Rule of Civil Procedure 24(a)(1). (Dkt. # 56.) LaCroix and Berish are public school teachers, and Cruz is employed by the Wisconsin Department of Employee Trust Funds. All three object to being compelled to pay union fees as a condition of employment and to being forced to be represented by two of the plaintiff unions. These proposed intervening defendants seek to argue that mandatory union membership and the payment of dues violate their First Amendment rights.

As for this intervention motion, the law is well-established that "employees can be required to contribute fair share fees to compensate unions for their representational activities." *Sorrell v. Am. Fed'n of State, Cnty., Mun. Employees,* 52 Fed. Appx. 285, 287 (7th Cir.2002) (citing *Lehnert v. Ferris Faculty Ass'n,* 500 U.S. 507, 519, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991)). As importantly, plaintiffs' challenge to Act 10 does not seek to overturn the fair share allotment of dues payments by dissenting employees, like the proposed intervening defendants. The proposed intervening defendants' unique First Amendment claim is, therefore, tangential to the subject matter of this lawsuit. *See Keith v. Daley,* 764 F.2d 1265, 1268 (7th

Cir.1985) ("[T]he applicant must have a direct and substantial interest in the subject matter of the litigation."). In all other respects, the current defendants can adequately represent their interests. *See Ligas ex rel. Foster v. Maram,* 478 F.3d 771, 774 (7th Cir.2007) ("[W]hen the representative party is a governmental body charged by law with protecting the interests of the proposed intervenors, the representative is presumed to adequately represent their interests unless there is a showing of gross negligence or bad faith."). Accordingly, the court will deny this motion to intervene.

Also before the court is a motion to intervene as plaintiffs by Wisconsin Law Enforcement Association ("WLEA"), Tracy A. Fuller, Jill A. Buzick and Kathryn M. Rozmarynoski. (Dkt. # 63.) WLEA is an organization consisting of three local unions with general employees and public safety employees as members. Fuller, Buzick and Rozmarynoski are WLEA members. WLEA contends that it is the only state-wide bargaining unit that includes both categories of employees, and seeks to intervene because of this "unique" position. While WLEA's position may well be unique, it has not explained—nor does its proposed complaint suggest—how its claims are different than those of the plaintiffs, nor as importantly why plaintiffs will not adequately represent WLEA's interest. Accordingly, the court will also deny WLEA's motion to intervene.

■ *Second,* a number of parties seek leave to file amicus briefs. The policy of the Seventh Circuit, which this court will follow here, is to "grant permission to file an amicus brief only when (1) a party is not adequately represented (usually, is not represented at all); or (2) when the would-be amicus has a direct interest in another case, and the case in which he seeks permission to file an amicus curiae brief, may by operation of stare decisis or res judica-

ta materially affect that interest; or (3) when the amicus has a unique perspective, or information, that can assist the court of appeals beyond what the parties are able to do." *Nat'l Org. for Women, Inc. v. Scheidler,* 223 F.3d 615, 617 (7th Cir.2000). While the court has denied LaCroix's, Berish's and Cruz's motions to intervene, the court will grant LaCroix's motion to file an amicus brief in opposition to plaintiffs' motion for temporary restraining order (dkt. # 45) and their collective motion to file an amicus brief in support of defendants' motion for judgment on the pleadings and in opposition to plaintiffs' motion for summary judgment (dkt. # 91). Arguably, at least, each has a unique perspective on the First Amendment implications of Act 10 which may be of some assistance to the court.

James Holmes, a self-described "resident citizen taxpayer of the State of Wisconsin," also seeks leave to file an amicus brief in opposition to plaintiffs' motion for a temporary restraining order. (Dkt. # 67.) Not only is that motion mooted by the court's dispositive ruling today, but the court finds the proposed amicus brief of no assistance and, therefore, Holmes' motion will be denied.

Two public interest groups—the Landmark Legal Foundation and the United States Justice Foundation—have also moved for leave to file amicus briefs in support of defendants' position. (Dkt. ## 98, 102.) Neither proposed brief materially advances defendants' arguments beyond what defendants themselves have presented. Moreover, the Seventh Circuit specifically warns against attempts by amicus curiae "to inject interest-group politics" into the federal courts. *Nat'l Org. for Women,* 223 F.3d at 617. Accordingly, the court will also deny Landmark Legal Foundation's and the United States Justice Foundation's respective motions for leave to file amicus briefs.

*Third,* in opposition to plaintiffs' motion for a temporary restraining order, defendants submitted an affidavit of then-Deputy Secretary of the Department of Administration Cynthia Archer describing the analysis conducted to determine which employees should be placed within the "public safety" category. (Affidavit of Cynthia Archer ("Archer Aff.") (dkt. # 42).) Defendants resisted plaintiffs' attempt to depose Archer and, as a solution, now seek leave to withdraw Archer's affidavit.[4] (Dkt. # 80.) Defendants' request is, at best, unorthodox. Having opened the door, the court would under ordinary circumstances have ordered discovery of an affiant to proceed, whether or not the proponent later withdraws the affidavit. Here, however, plaintiffs do not oppose withdrawal of the affidavit, and therefore the court will grant defendants' request to withdraw Archer's affidavit, though will consider it to the extent relied upon by plaintiffs.[5]

## UNDISPUTED FACTS[6]

### A. The Parties

Plaintiffs are labor organizations, exclusive collective bargaining representatives of certain state and municipal employees,

and organizations of affiliated labor organizations, within the meaning of Wis. Stat. §§ 111.70(1)(h), 111.81(12), and 111.96(13) (repealed by 2011 Wis. Act 10).[7] Defendants are all state officials who have constitutional or statutory authority for implementing or administering Act 10.

### B. Overview of 2011 Wisconsin Act 10

At Wisconsin Governor Scott Walker's request, Act 10 was introduced in a special session of the Legislature on February 14, 2011 as Special Session Senate Bill 11. The Governor publicly identified the bill as a "Budget Repair Bill." In press releases and public addresses, the Governor asserted that Act 10 was needed to balance the state budget and to give state and municipal governments the tools to manage their budgets during economic crisis.

Act 10 passed on March 11, 2011. A Wisconsin state circuit court initially enjoined the Act from being published or implemented, finding that the Act was adopted in violation of the Wisconsin Open Meetings Law, Wis. Stat. § 19.81. The injunction was lifted by the Wisconsin Supreme Court on June 14, 2011,[8] and the Act took effect on June 28, 2011.

---

4. In the same motion, defendants also seek leave to amend their opposition to plaintiffs' motion for a temporary restraining order and an order barring discovery concerning the information contained in Archer's affidavit. Defendants offer no justification for the delay in seeking leave to amend their opposition, and therefore the court denies that request. As for the order barring discovery, plaintiffs do not appear to oppose this request, but in any event, it is rendered moot by this decision.

5. There are a few additional motions. The court grants plaintiffs' motion to file a reply brief in response to defendants' opposition to plaintiffs' motion for a temporary restraining order. (Dkt. # 48.) The court also denies as moot plaintiffs' motion for a temporary restraining order (dkt. # 11) and plaintiffs' motions for oral argument (dkt. ##12, 24, 105).

6. The court finds the following facts to be material and undisputed consistent with the parties' proposed findings of fact.

7. The plaintiff unions here have standing to sue on behalf of their members. *See S. Ill. Carpenters Welfare Fund v. Carpenters Welfare Fund of Ill.,* 326 F.3d 919, 922 (7th Cir.2003) (citing *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)); *see also Wis. Right to Life State Political Action Comm. v. Barland,* 664 F.3d 139, 148 (7th Cir.2011) ("In addition to its own Article III injury, the Right to Life PAC has standing to sue to vindicate the political-speech rights of its contributors.")

8. *See State ex rel. Ozanne v. Fitzgerald,* 2011 WI 43, 334 Wis.2d 70, 798 N.W.2d 436. This decision is currently the subject of a motion

The Act amends statutes that govern public sector labor relations in Wisconsin, including the Municipal Employment Relations Act ("MERA"), Wis. Stat. § 111.70 *et seq.*, the State Employment Labor Relations Act ("SELRA"), Wis. Stat. § 111.80 *et seq.*, the Wisconsin Employment Peace Act ("WEPA"), Wis. Stat. § 111.01 *et seq.*, and the UW System Faculty and Academic Staff Labor Relations Act ("FASLRA"), Wis. Stat. § 111.95 *et seq.* Central to the unions' claims, Act 10 creates two new categories of employees: "public safety employees" and "general employees."

Under Act 10, "public safety employees" are defined as:

SECTION 216. 111.70 (1)(mm) [part of MERA] of the statutes is created to read:

111.70 (1)(mm) "Public safety employee" means any municipal employee who is employed in a position that, on the effective date of this paragraph.... [LRB inserts date], is classified as a protective occupation participant under any of the following:

1. Section 40.02(48)(am) 9. [a police officer], 10. [a fire fighter], 13. [a deputy sheriff], 15. [a county traffic police officer], or 22. [a person employed as a village police officer and fire fighter].

2. A provision that is comparable to a provision under subd. 1. that is in a county or city retirement system.

. . .

SECTION 272. 111.81 (15r) [part of SELRA] of the statutes is created to read:
111.81 (15r) "Public safety employee" means any individual under s. 40.02(48)(am) 7. [a member of the state traffic patrol] or 8. [a state motor vehicle inspector].

2011 Wis. Act 10 §§ 216, 272, attached as Ex. B to Affidavit of Timothy E. Hawks ("Hawks Aff.") (dkt. # 15–2).

The "public safety employee" classification does not correspond to any classification of employees in any previous Wisconsin law. By way of illustration, the Wisconsin Public Employee Trust Fund, Wis. Stat. § 40.02(48)(am), defines twenty-two job categories as "protective occupation employees." Of these twenty-two categories, only five—police officers, deputy sheriffs, fire fighters, county traffic police officers and village employees who perform both police protection and fire protection services—fall within the "public safety employee" category under MERA, and only two—troopers and motor vehicle inspectors in the State Patrol—are "public safety employees" under SELRA. In particular, "public safety employees" do not include police officers and fire fighters who work for the State, namely the Capitol Police, the UW Campus Police, and Fire/Crash Rescue Specialists.

Under the Act, "general employees" is simply a catch-all term for every other Wisconsin public-sector employee covered by MERA and SELRA who is *not* a "public safety employee." *See, e.g.,* 2011 Wis. Act 10 §§ 214, 268 (" 'General employee' means an employee who is not a public safety employee").

## C. Restrictions on Collective Bargaining Rights of General Employees[9]

The unions challenge three provisions of

for relief from judgment. Mot. for Recusal of Justice M. Gableman and Motion for Relief from J., *State ex rel. Ozanne v. Fitzgerald,* No.2011AP000613–LV (Wis. Dec. 30, 2011).

9. Defendants criticize plaintiffs' use of the term "rights" as in the phrase "collective bargaining rights," implying that plaintiffs' use is intended to suggest an inalienable, or at least constitutional, right to collectively bargain. (Defs.' Br. in Supp. of Mot. for J. on Pleadings (dkt. # 76) 7.) At least in a legal context, however, the term "rights" need not

Act 10, each of which treat "public safety employees" differently from "general employees." *First,* under Act 10, unions representing "general employees" are no longer permitted to bargain collectively over a broad array of topics related to wages, hours, and conditions of employment. Instead, collective bargaining is limited to "only total base wages and excludes any other compensation, which includes, but is not limited to, overtime, premium pay, merit pay, performance pay, supplemental compensation, pay schedules, and automatic pay progressions." 2011 Wis. Act 10 §§ 210, 245, 262, 314. Moreover, unions representing general employees are specifically prohibited from negotiating fair-share agreements whereby non-union members pay the unions for the benefit of their collective bargaining efforts. *Id.* at §§ 190–192, 198, 200, 203, 219 (repealing or otherwise amending fair-share agreement provisions for general employees). These restrictions do not apply to public safety employees. *Id.* at §§ 210, 262.

*Second,* once any collective bargaining agreement in effect at the time of Act 10's enactment has expired or terminated, unions representing general employees must submit to recertification each year. At least 51 percent of all general employees in the collective bargaining unit must vote to recertify—an absolute majority. 2011 Wis. Act 10 at §§ 242, 289, 9132, 9155. This annual recertification requirement differs from the prior law, which still applies to public safety employees, in at least two important respects. As an initial matter, no recertification elections are required at any time unless 30 percent of all general members vote for decertification.

Even if an election is called for, a public safety union is recertified if it obtains 51 percent support from those members who actually *vote*—a simple majority. Wis. Stat. §§ 111.70(3)(a)4, (4)(d)5, 111.83(6); Wis. Admin. Code §§ ERC 11.02(3), 21.02.

*Third,* employers are prohibited from deducting union dues or fair-share fees from the payroll checks of general employees. 2011 Wis. Act 10 at §§ 227, 298 ("The employer may not deduct labor organization dues from a general employee's earnings."). This service continues for public safety employees and their unions. *Id.* at §§ 58, 213, 217, 225, 295, 299.

### D. Makeup of "Public Safety Employees" Unions

The two largest protective occupation bargaining units under MERA are the Milwaukee police officers and the Milwaukee fire fighters. The Milwaukee police officers are represented by the Milwaukee Police Association ("MPA") and the Milwaukee fire fighters are represented by Milwaukee Professional Fire Fighters, Local 215 ("Local 215"). Both MPA and Local 215 endorsed Governor Walker's 2010 gubernatorial campaign and participated in a television advertisement supporting him. The West Allis Professional Police Association and the Wisconsin Sheriffs and Deputy Sheriffs Association PAC also endorsed Governor Walker. All are classified as "public safety employees."

Wisconsin Law Enforcement Association ("WLEA") is the collective bargaining representative for state troopers, other employees of the Wisconsin State Patrol, and many other law enforcement personnel who work for the State, including the Cap-

---

be so fundamental. Thus, courts often refer to rights derived from other sources. *See, e.g., Alabama v. North Carolina,* —— U.S. ——, 130 S.Ct. 2295, 2316, 176 L.Ed.2d 1070 (2010) (describing "statutory and contractual

rights"). Since collective bargaining rights for state and local public employees are a creature of state statute, a fact that neither plaintiffs nor defendants dispute, defendants' criticism is, at best, a linguistic red herring.

ital Police and the UW Campus Police. Of these groups, the Wisconsin Troopers Association ("WTA"), the lobbying group for employees of the Wisconsin State Patrol, including troopers and motor vehicle inspectors, is the only one in WLEA that endorsed Governor Walker. They are also the only category of employees classified as "public safety employees" under Act 10.

Correctional officers, probation and parole officers, conservation wardens and fire crash rescue specialists are also protective occupation employees under Wis. Stat. § 40.02, represented by plaintiff Wisconsin State Employees Union, AFSCME District Council 24 ("Council 24"), but are not classified as "public safety employees" under the Act. Special criminal investigation agents in the Wisconsin Department of Justice are also protective occupation employees, represented by plaintiff AFT–Wisconsin, AFL–CIO ("AFT–Wisconsin"), but are not classified as "public safety employees" under Act 10. Council 24 and AFT–Wisconsin, along with all of the other plaintiff unions, endorsed Governor Walker's opponent in the 2010 Wisconsin gubernatorial race.

All members of labor organizations that endorsed Governor Walker are classified as "public safety employees" under Act 10, as well as some who did not. For his part, the Governor stated in advance of its enactment that "public safety employees" were exempted from the collective bargaining changes under the Act in order to avoid the prospect of law enforcement and fire fighting employees striking, orchestrating work stoppages or engaging in other disruptive conduct in response to its enactment.

### E. Alleged Adverse Effects on Political Activities of General Employees Unions[10]

In addition to traditional collective bargaining activities, the plaintiff unions engage in lobbying and political activity, including legislative and issue advocacy, get-out-the-vote efforts, voter guides, candidate endorsements, ballot measure activity and member communications advocating the election or defeat of political candidates. Independent of losses due to the non-payment of dues by non-members and free-riding members of general employee unions, the loss of dues revenue caused by the Act's prohibition on voluntary payroll dues deductions by remaining members and the resources exerted in implementing alternative dues collection systems will limit those unions' ability to engage in political and other speech activities.

For example, plaintiff Wisconsin Education Association ("WEAC") provides reasonable estimates, without contradiction by defendants, that the loss of an automatic dues deduction option for its voluntary members will amount in an *additional* $375,000 reduction in the portion of its dues contributions set aside for certain types of political activity.[11] There is also

---

**10.** Plaintiffs propose a number of adverse effects on general employees caused by the challenged provisions of Act 10, primarily focusing on the restrictions to collective bargaining rights. While defendants do not dispute these facts, they argue that the impact of Act 10 is largely immaterial to plaintiffs' claims. As explained below, facts relevant to the provision prohibiting dues withholding from general employees may be material to plaintiffs' First Amendment claim, at least in the court's view, and therefore are described here.

**11.** The estimated losses from the Act's prohibition on employer dues and "fair-share" deductions are far larger. For example, the plaintiff unions estimate that they will lose 25 to 50 percent or more of members' net dues income even if alternative dues collection systems are established. (Pls.' PFOFs (dkt. # 90) ¶ 65.) WEAC alone estimates losing over half a million dollars per month in union dues. (Declaration of Daniel Burkhalter (dkt. # 16) ¶ 13.)

no dispute that this loss of dues revenue will diminish WEAC's ability to make independent expenditures on behalf of political candidates and will require it to lay off four lobbyists from its staff. Finally, again without dispute, WEAC contends that its reduced political activity budget will seriously impair its ability to represent the interests of its members before local, state, and federal legislative and regulatory bodies.

## OPINION

### I. Equal Protection Claims

■■■ The parties agree that the court analyzes and reviews plaintiffs' Equal Protection claims under a rational basis standard. "The analysis breaks down into two questions: (1) whether the statute's purpose is reasonable, and (2) whether the statute rationally advances that purpose." *Moran v. Beyer,* 734 F.2d 1245, 1247 (7th Cir.1984) (finding a statute's purpose of maintaining marital harmony an "admirable goal," but finding that "prevent[ing] a married person from seeking a remedy which is available to an unmarried person" is not rationally related to that goal). "[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). "By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Id.* at 632, 116 S.Ct. 1620.

### A. Collective Bargaining Restrictions for General Employees

■■■ There is no dispute that a state may bar its public employees from engaging in any form of collective bargaining.

The only question is whether a state may restrict the collective bargaining rights to one category of public unions while allowing full rights to another category. The answer to that question is surely "yes," provided the classifications do not involve a suspect class and a rational basis exists for a state's line drawing. Here, there is no suspect class involved and plaintiffs have failed to present sufficient evidence that exempting public safety employees from the new, expansive restrictions on collective bargaining bears no rational relationship to a legitimate government interest in avoiding strikes of those employees.

As an initial matter, providing basic, emergency services is a core governmental function. *See, e.g., Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 575, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (describing "fire prevention, police protection, sanitation, and public health as typical of [the services] performed by state and local governments in discharging their dual functions of administering the public law and furnishing public services" (internal citation and quotation marks omitted)). While plaintiffs point out that some police employees (e.g., the Capital Police and University of Wisconsin Police) and many other statutorily-recognized "protective occupation employees" were classified as general employees—arguably subjecting the public to increased risk of strikes, work stoppages or other disruptive actions in response to *their* loss of bargaining rights—this alone does not undermine the express purpose of the Act under a rational basis review. *Zehner v. Trigg,* 133 F.3d 459, 463 (7th Cir.1997) ("Most of the plaintiffs' arguments criticize the statute for being either overinclusive or underinclusive; under rational basis review, however, the classification need not be the most narrowly tailored means available to achieve the desired end.").

Wisconsin's Governor and Legislature may have concluded that they would extend full bargaining rights to those public unions representing members performing only the most essential functions for maintaining public safety—a political judgment left to those branches of government. The fact that many of these same unions may coincidentally—or as plaintiffs persuasively argue, even strategically—be the most supportive of the party in power at the time of enactment is not enough to heighten the court's legal scrutiny. *See Hearne v. Bd. of Educ. of the City of Chi.*, 185 F.3d 770, 773 (7th Cir.1999) (noting plaintiffs' argument that the act at issue was passed to "retaliate against them for their political activities" and still finding it passed rational basis review). Under our system of government, this is deemed a matter for the next election. *Id.*

Moreover, given the significant controversy surrounding the passage of Act 10, the court cannot wholly discount the defendants' expressed concerns: exempting public safety employees from severe restrictions on collective bargaining rights may rationally be related to a legitimate government interest of avoiding work stoppages by certain public employees performing core governmental services. In response, plaintiffs point out that strikes by these same employees is already prohibited by laws, but this alone does not undermine the State's rationale. As defendants note, public sector employees have gone on strike in the past despite statutory, anti-strike provisions. (Defs.' Mot. for J. on Pleadings Br. (dkt. # 76) 18.) Ironically enough, the fact that unions representing public safety employees generally *supported* the Governor in his

gubernatorial campaign undermines plaintiffs' argument, at least to the extent that public safety unions may have felt even more wronged if Act 10 *had* stripped their collective bargaining rights along with other public unions, making more credible concerns that these unions would resort to illegal work stoppages or other disruptive activities.

While the court concludes that the carving out of public safety employees under the Act is rationally-related to a legitimate government interest in avoiding disruptions by those employees, at least facially, it cannot wholly discount evidence that the line-drawing between public safety employees and general employees was influenced (or perhaps even dictated) by whether the unions representing these employees supported Governor Walker's gubernatorial campaign. The Act's treatment of the Capital Police, who endorsed the Governor's opponent, in comparison to its treatment of state vehicle inspectors, who endorsed the Governor, best illustrates this suspect line-drawing.[12] As the Seventh Circuit explained in *Zehner*, however, the statutory definitions of the two classes may have been over or under inclusive is not enough to render a statute unconstitutional "under rational basis review." 133 F.3d at 463.

■ In addition, as defendants demonstrated, the public employee classification is not limited solely to those unions who endorsed the Governor, though *all* unions that endorsed him during the 2010 gubernatorial election fall within the public safety classification. "In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest,

12. While defendants acknowledged that, as part of its study, the "DOA identified a probable gap in staffing for state building and staff security in the event of large scale protests," the Capital Police were placed in the general employee category. (Archer Aff. (dkt. # 42)

¶ 9.) In contrast, all of the Wisconsin Trooper Association's protective-service members, including state vehicle inspectors, were placed in the exempted public safety employee category.

even if the law seems unwise or works to the disadvantage of a particular group[.]" *Romer*, 517 U.S. at 632, 116 S.Ct. 1620. "Indeed, one might think that this is what election campaigns are all about: candidates run on a certain platform, political promises made in the campaign are kept (sometimes), and the winners get to write the laws." *Hearne*, 185 F.3d at 773.

This is not an ordinary case in any number of respects, but it *is* ordinary in the sense that political favoritism is no grounds for heightened scrutiny under the Equal Protection clause. Indeed, cases finding the true reason for legislation is pure animus directed at a particular group—which cannot form the basis of a legitimate government interest—typically involve powerless groups, like "hippies" in *Moreno* or gay and lesbian citizens of Colorado in *Romer*. Act 10 may cripple unions representing general employees, but these unions and its members are certainly not a powerless class.

Even assuming the lack of an adequate rationale for distinguishing between public safety and general employee unions, the Equal Protection Clause does not require that a state institute changes wholesale. As discussed, the State of Wisconsin could have eliminated all rights of public employees to unionize. That it chose to implement changes piecemeal, for one class of public unions at this time, while neglecting others, is not a constitutional violation.

"The prohibition of the Equal Protection Clause goes no further than invidious discrimination." *Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955).[13]

## B. Recertification Requirements for General Employee Unions

In defending Act 10, defendants focus principally on plaintiffs' challenge to selective restrictions on the collective bargaining rights of general employees, articulating no more than a surface-level connection between the purported governmental interest in avoiding strikes of public safety employees and the two other provisions challenged by plaintiffs—namely, the annual recertification requirement and the prohibition on dues withholding for general employees. Perhaps this is because the relationship between the interest of avoiding strikes and these other challenged provisions is substantially more tenuous. Act 10's exemption of public safety employees from the annual recertification requirement and the prohibition on dues withholding certainly has no obvious relationship to the government's supposed concern with disruptions by public safety employees.

Putting aside the dues withholding provision for the moment, plaintiffs have established, at least on this record, that requiring annual recertification by a labor union, much less by an absolute majority, is unprecedented.[14] The Supreme Court

---

**13.** As Justice Brandeis explained in his dissent in *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932), restricting the states' ability to experiment "in things social and economic is a grave responsibility ... fraught with serious consequences to the nation." *See also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 43, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) ("In such circumstances, the judiciary is well advised to refrain from imposing on the States inflexible constitutional restraints that could circumscribe or handicap contin-

ued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions.").

**14.** For this factual finding, plaintiffs offer a declaration from Professor Joseph Slater, who specializes in public sector labor law and public sector labor history. (Dkt. # 23.) Professor Slater simply states "no other labor law requires yearly elections." (*Id.* at ¶ 10.) In response to plaintiffs' motion for temporary restraining order, defendants argued that this statement is conclusory and that the court

has indicated that "[t]he absence of precedent for [an act] is itself instructive; '[d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision.'" *Romer,* 517 U.S. at 633, 116 S.Ct. 1620 (quoting *Louisville Gas & Elec. Co. v. Coleman,* 277 U.S. 32, 37–38, 48 S.Ct. 423, 72 L.Ed. 770 (1928)).

Still, the court finds this onerous recertification provision would typically pass the admittedly low bar of rational basis review, but for defendants' failure to articulate and this court's inability to posit, how an annual, absolute majority vote by a wholly-voluntary union could rationally advance a reasonable purpose. Unlike the concern over work stoppages by public safety employees restricted as to their bargaining rights, the requirement for annual proof of support by an absolute majority of union members applies only to general employee unions who are unable to compel any participation of *any* employee in its union activities, even the payment of a "fair share" fee. The only right granted this union is to bargain collectively on an adjustment in base pay. Even if this Governor and the Legislature had a reasonable concern that this remaining bargaining right might be abused, the concern is not rationally advanced by an unprecedented burden on a voluntary union's right to continue to exist from year to year. On the contrary, it seems irrational to impose this unique burden on a *voluntary* union with highly restrictive bargaining rights while maintaining far less burden on public safety unions in which involuntary membership and monetary support continue to be mandated by law. *See State ex rel. Dayton Fraternal Order of Police Lodge No. 44 v. State Emp't Relations Board,* 22 Ohio St.3d 1, 488 N.E.2d 181, 186 (1986) (finding provision which denied certain Dayton municipal employees collective bargaining rights to be "the very kind of arbitrary legislative enactment that is prohibited by the equal protection guarantees of both the Ohio and United States Constitution").

Even though plaintiffs do not assert a First Amendment claim with respect to this onerous, annual recertification requirement for unions representing general employees and their members, focusing instead on the difficulty and expense of securing recertification in the context of their Equal Protection claim, the court would be remiss not to at least note the likely burden the annual recertification process imposes on members' speech and association rights. Indeed, as it works a direct *burden* on general employee unions, its discriminatory application appears indefensible to a First Amendment challenge. *See* discussion *infra* Parts II.A, II.B. Even if not itself a direct violation of plaintiffs' First Amendment rights, the *appearance* of a partisan division of the two classes of unions is troubling. *Id.*

### C. Withholding of Union Dues

 Just as removed from the State's only proffered reason for two classifications of public unions—risk of strikes by

should reject it. At summary judgment, defendants go even further, inexplicably contending that it would be "impossible" to refute such a claim when, in fact, all defendants need have done is offer the court even *one* example of a similar requirement in any state or federal collective bargaining law. While plaintiffs do not develop this proposed fact further at summary judgment, defendants were placed on notice of Professor Slater's position and have come forward with nothing to suggest that Act 10's annual recertification requirement is a component of *any* law governing public, or for that matter, private sector unions. This leaves the court with an inevitable finding, however hyperbolic it may sound, that this legislation is indeed unprecedented.

police and fire fighters—is the distinction drawn by Act 10 between the automatic deduction of union dues for general employee and public safety unions. Indeed, it is even more irrational to deny a voluntary set off union dues to general union members who affirmatively request it while imposing an involuntary set off of dues by public safety union members who affirmatively oppose it. Even if such an upside down program somehow rationally advanced the Governor's and Legislature's expressed concern with avoiding a strike by public safety unions, however, this concern undermines defendants' argument for the constitutionality of Act 10 under the First Amendment analysis set forth below. *See Truck Drivers & Helpers Local Union No. 728 v. City of Atlanta*, 468 F.Supp. 620, 624 (N.D.Ga.1979) ("[S]o long as the City of Atlanta has unions within both its police and fire departments, and so long as it is willing to withhold union dues from the firemen, it must, under the equal protection clause make the same open to police employees.").

## II. First Amendment Claim

### A. Relationship between Dues and Speech

■■■ The plaintiffs represent, and defendants do not dispute, that dues withdrawn from general employees' paychecks are used to fund speech. As such, there are two distinct sets of "speakers" here. *First,* union members engage in expressive activity by joining a union. Associations, including unions, provide an opportunity for "like-minded persons to pool their resources in furtherance of common ... goals." *Buckley v. Valeo*, 424 U.S. 1, 23, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The Supreme Court has long-recognized that the First Amendment is implicated when dissenting public employees are required to fund union activities, including speech. *See Abood v. Detroit Bd. of Educ.*, 431

U.S. 209, 234–35, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), *criticized by Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Express & Station Employees*, 466 U.S. 435, 443, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984) (criticizing rebate program described in *Abood*). So, too, the payment of dues—some of which specifically fund political activity—constitutes an expressive activity. *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359, 129 S.Ct. 1093, 172 L.Ed.2d 770 (2009) (explaining that support of political activities through payroll deduction "can enhance the unions' exercise of First Amendment rights"); *Cornelius v. NAACP Legal Defense Fund, Inc.*, 473 U.S. 788, 799, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ("[A]n employee's contribution in response to a request for funds functions as a general expression of support for the recipient and its views.")

For this reason, the United States Supreme Court has repeatedly upheld the rights of dissenting members to withhold support of union activities unless germane to its role as exclusive bargaining representative—the fundamental right the Court has recognized as justifying mandatory unions. *See Davenport v. Wash. Educ. Assoc.*, 551 U.S. 177, 185, 127 S.Ct. 2372, 168 L.Ed.2d 71 (2007); *Chi. Teachers Union v. Hudson*, 475 U.S. 292, 305, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); *Abood*, 431 U.S. at 235–36, 97 S.Ct. 1782. The expressive nature of union membership is, if anything, heightened by the fact that general employees are no longer *required* under Act 10 to support any union activities—even core activities involving collective bargaining—making the deduction of union dues from the paychecks of general employees an entirely voluntary act.

*Second,* unions engage—indeed, one of their core functions is to engage—in speech. *See Citizens United v. Fed. Election Comm'n*, —— U.S. ——, 130 S.Ct. 876,

900, 175 L.Ed.2d 753 (2010) ("Corporations and other associations, like individuals, contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster." (internal citations and quotation marks omitted)). There is no dispute that the plaintiff unions engage in speech. (*See* Pls.' Br. (dkt. # 92) 52.) This speech is not limited to the realm of politics, but also constitutes other forms of expressive activity. (*Id.* at 52–53.)

Under Act 10, general employees may still pay voluntary dues and their unions may still engage in speech, including political speech. In that way, Act 10 does not prohibit general employee unions' or their members' speech, but it does bar the most efficient method by which these unions collect and their members pay dues. Defendants also concede that general employee unions have lost dues and will continue to lose dues because of this barrier to ease of payment.

While upholding a state's even-handed refusal to withhold dues, the Supreme Court acknowledged in *Ysursa* the value of the government's extension of automatic dues deductions by labeling the arrangement as "subsidiz[ing] the exercise of a fundamental right," "assist[ing] others in funding the expression of particular ideas," "enhance[ing] the unions' exercise of First Amendment rights," "aid[ing] the unions in their political activities," "enlisting the State in support of [their First Amendment] endeavor[s]," "facilitat[ing] speech," and "affirmatively assist[ing] ... speech." 555 U.S. at 358–59, 362, 364, 129 S.Ct. 1093. Similarly, selectively prohibiting public employers from providing this service to general employees and their unions necessarily diminishes their speech—both general employees' ability to support their union financially, as well as the union's ability to fund its speech. *See Citizens United*, 130 S.Ct. at 898 (noting that less

spending on speech " 'necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of the exploration, and the size of the audience reached' " (quoting *Buckley*, 424 U.S. at 19, 96 S.Ct. 612)). Moreover, the fact that unions can create alternative means to collect dues does not ameliorate this restriction. *Cf. Citizens United*, 130 S.Ct. at 897 (finding speech of corporations hindered even though corporations could speak through the "burdensome alternative" of PACs).

The Supreme Court has also repeatedly recognized that a burden on speech, rather than an outright ban, is still subject to heightened scrutiny. *See Sorrell v. IMS Health, Inc.*, —— U.S. ——, 131 S.Ct. 2653, 2664, 180 L.Ed.2d 544 (2011) ("The Court has recognized that the 'distinction between laws burdening and laws banning speech is but a matter of degree' and that the 'Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.' " (quoting *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 812, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000))); *see also Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 152 (7th Cir.2011) ("Laws that burden political speech are subject to strict scrutiny[.]" (quoting *Citizens United*, 130 S.Ct. at 898)).

If plaintiffs' First Amendment claim falters, it is not on proof of an impact on their speech, but rather on proof that the State is affirmatively abridging that speech. In *Ysursa*, the Supreme Court considered a challenge by public employee unions to an Idaho statute banning public-employee payroll deductions for political activities on the basis that it violated their free speech rights. Citing *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 549, 103 S.Ct. 1997, 76

L.Ed.2d 129 (1983), the *Ysursa* Court explained:

> The First Amendment ... protects the right to be free from government abridgment of speech. While in some contexts the government must accommodate expression, it is not required to assist others in funding the expression of particular ideas, including political ones.... [A] legislature's decision *not* to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny.

555 U.S. at 358, 129 S.Ct. 1093 (emphasis added). Applying rational basis review, the Court went on to conclude that a prohibition on payroll deductions for political activity was rationally related to the "State's interest in avoiding the reality or appearance of government favoritism or entanglement." *Id.* at 359, 129 S.Ct. 1093.

In so holding, the majority's opinion specifically addressed Justice Breyer's concern in dissent that "the ban on political payroll deductions may not be applied evenhandedly." *Id.* at 361 n. 3, 129 S.Ct. 1093. The Court noted that the ban "was not limited to any particular type of political contribution," and that it "applies to *all* organizations" and "to *all* employers." *Id.* (emphasis added).[15] The majority explained, however, that "[i]f the ban is not

enforced evenhandedly, plaintiffs are free to bring an as-applied challenge." *Id.*

## B. Speaker Discrimination

Unlike the Idaho statute in *Ysursa*, the dues withholding ban at issue here applies to a subset of public employees. General employees and their unions are treated differently as speakers than public safety employees and their unions. Moreover, as *Ysursa* suggests, such speaker discrimination—independent of content or viewpoint discrimination—can form the basis of a valid First Amendment challenge. *See, e.g., Sorrell*, 131 S.Ct. at 2664 (applying strict scrutiny review to provision of statute which disfavors specific speakers, namely pharmaceutical manufacturers, and finding the provision unconstitutional); *Citizens United*, 130 S.Ct. at 898 (noting that in addition to "attempts to disfavor certain subjects or viewpoints," the First Amendment also prohibits "restrictions distinguishing among different speakers, allowing speech by some but not others") (citing *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)); *Brown v. Alexander*, 718 F.2d 1417, 1426 (6th Cir.1983) (finding eligibility requirement for dues withholding that an organization be "independent," meaning non-affiliated with another labor organization, "strikes at the heart of free-

---

**15.** Circuit court cases predating *Ysursa* similarly held dues withholding bans constitutional where the bans were applied evenhandedly to all public employees. *See, e.g., Toledo Area AFL–CIO Council v. Pizza*, 154 F.3d 307, 319 (6th Cir.1998) (finding Ohio wage checkoff ban constitutional where *"[a]ll* Ohio public employees are denied the benefits that might be derived from such publicly-administered programs"); *Ark. State Highway Employees Local 1315 v. Kell*, 628 F.2d 1099, 1103 (8th Cir.1980) (holding Department's decision to cease withholding of union dues as to all union members constitutional). Circuit courts also upheld bans where states had limited dues withholding to organizations open

to all state employees, rather than some discrete, selective subset. *See, e.g., City of Charlotte v. Local 660, Int'l Ass'n of Firefighters*, 426 U.S. 283, 288, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976) (holding that city's provision only allowing withholding for "programs of general interest in which all city or departmental employees can, without more, participate" did not violate the Equal Protection Clause); *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1264 (4th Cir.1989) (rejecting equal protection challenge where legislation allowed paycheck deductions for *general interest groups*, but not for special interest groups like the plaintiff union).

dom of association"). "The First Amendment protects speech *and speaker*, and the ideas that flow from each." *Citizens United*, 130 S.Ct. at 899 (emphasis added).

In response to this argument, defendants contend that plaintiffs have not demonstrated that general employees and their unions have different viewpoints than public safety employees and their unions. For example, defendants offer evidence to suggest that all public unions may share critical opinions of Act 10. But this does not mean that general employee unions do not have different political viewpoints than public safety employee unions. Defendants simply frame the inquiry too narrowly. The fact that *none* of the public employee unions falling into the general category endorsed Walker in the 2010 election and that *all* of the unions that endorsed Walker fall within the public safety category certainly suggests that unions representing general employees have different viewpoints than those of the unions representing public safety employees. Moreover, Supreme Court jurisprudence and the evidence of record strongly suggests that the exemption of those unions from Act 10's prohibition on automatic dues deductions enhances the ability of unions representing public safety employees to continue to support this Governor and his party.

Plaintiffs' First Amendment claim may be reasonably viewed as a challenge to the underinclusivity of Act 10's prohibition on dues withholding. Act 10 expressly exempts public safety employees from the prohibition, representing "a governmental 'attempt to give one side of a debatable public question an advantage in expressing its views to the people.' " *City of Ladue v. Gilleo*, 512 U.S. 43, 51, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (quoting *First Nat'l Bank of Boston*, 435 U.S. at 785–86, 98 S.Ct. 1407). In *Ladue*, the Supreme Court held that a city ordinance which "permits commercial establishments, churches and nonprofit organizations to erect certain signs that are not allowed at residences" violated the free speech rights of those residents. *Id.* at 45, 114 S.Ct. 2038. The Court did not rest its holding on content or viewpoint discrimination. Indeed, the plaintiff's challenged sign—a 24–by 36–inch sign printed with the words, "Say No to War in the Persian Gulf, Call Congress Now"—would have been permissible if placed in the yard of a church or a nonprofit organization concerned with pacifist issues.

As the Court explained in *Ladue*, "[e]xemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination: They may diminish the credibility of the government's rationale .for restricting speech in the first place." *Id.* at 52, 114 S.Ct. 2038 (citing *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424–26, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993)); *see also Citizens United*, 130 S.Ct. at 906 ("The law's exception for media corporations is, on its own terms, all but an admission of the invalidity of the antidiscrimination rationale. And the exemption results in a further, separate reason for finding this law invalid: Again by its own terms, the law exempts some corporations but covers others, even though both have the need or the motive to communicate their views."). To ignore the potential for undermining the credibility of the government's rationale for supplementing the speech of public safety employees and their unions over general employees and their unions—where substantial evidence has been offered of their distinct viewpoints—would be a particular disservice to the First Amendment.

Recently, the District of Arizona enjoined a state statute (1) requiring all public employee unions that collect dues

through payroll deductions to either affirm to the employers that none of their funds are used for "political purposes" or specify the percentage of their general fund so used, and (2) for any unions using funds for political purposes, requiring that the union members provide written authorization each year permitting paycheck withholding for dues. *United Food & Commercial Workers Local 99 v. Brewer*, 817 F.Supp.2d 1118, 1121–22 (D.Ariz.2011). As with Act 10, these new regulations on dues withholding did not apply to five categories of "public safety employees." *Id.* The district court concluded that the plaintiff unions were likely to succeed on the merits of the First Amendment claim because the statute at issue was not "evenhanded." *Id.* at 1126–27 (citing *Ysursa*, 555 U.S. at 361 n. 3, 129 S.Ct. 1093). "By imposing its burdens on the political speech of some unions and other organizations and not imposing like costs upon other similarly-situated unions, or on other organizations that can use the funds for political activity, the law is underinclusive and discriminates according to the speaker." *Id.* at 1126 (citing *City of Ladue*, 512 U.S. at 51, 114 S.Ct. 2038).

The problem with this court's reliance on the District of Arizona's reasoning in *United Food*—as well as on the other First Amendment cases cited above—is that each involved an affirmative burden on the speaker, as opposed to a denial of a subsidy. For example, in *United Food*, the Arizona statute imposed certain *reporting obligations* upon public employee unions that collected dues using deductions that were not imposed on public safety unions and others. Plaintiffs understandably view the distinction here as unimportant, and it may well be as a practical matter, but this court cannot ignore the distinction drawn between impingements on speech and a government's refusal to

subsidize it. Indeed, this is the very distinction upon which the *Ysursa* decision turned.

One could argue that any government subsidy to an individual entity or group may increase their voice—or amplify their speech, if you will—thereby favoring one group of speakers over others. In varying degrees, this may well be true. Developers who are awarded tax incremental financing are likely to "speak" in the public square on all sorts of issues, not to mention support politicians and political parties who support their views, including the need for tax incremental financing. So, too, do road builders who vie for government contracts, as do individuals who receive other subsidies from farm credits to food stamps (though it may require substantially more collective action to be heard). No one has argued that any of these subsidies—available only to members of a favored group—violates the First Amendment, or if they have, no court has found it so. For better or worse (and it may be both), this is how our political system works.

The question is whether the selective supplementation of the fundraising ability of a class of public unions is somehow different. There are strong arguments that it should be. *First*, unions themselves are inherently political, organizing to give collective voice for bargaining with governmental employers, as well as educating the public and advocating to politicians and the government, and participating in elections. Indeed, as discussed, a whole body of case law has grown up around the union's role as "speaker," though in the main to protect the dissenting members of a legally-sanctioned union shop from having their mandatory dues supplement the speech of the majority. *See Communications Workers of Am. v. Beck*, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988).[16]

**16.** Here, we have the mirror image. While the State of Wisconsin continues to mandate

*Second,* and far less persuasive as a legal matter because it is both fact specific and subjective (though far more powerful as a rhetorical matter for those who agree), Act 10 was enacted in the maelstrom of a political sea change in Wisconsin, the Act itself being the principal lightening rod around which the tumult reached its heights, at least to date. Whether or not the prohibition on automatic dues deductions for most public unions, but not those who supported the new Governor and Legislature, was an intentional act to suppress the speech of those who opposed then, it has that appearance.

While "the First Amendment certainly has application in the subsidy context," the government "may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *Nat'l Endowment for the Arts v. Finley,* 524 U.S. 569, 587–88, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998). The obvious exception for the government's wide berth in this area arises where the government "invidiously" discriminates based on viewpoint. *Id.; see also Toledo Area AFL–CIO Council v. Pizza,* 154 F.3d 307, 320–21 (6th Cir.1998) ("This is not to say that the government can place conditions on the receipt of state-created benefits that have

the effect of dissuading people from exercising a constitutional right, even if the government has absolute discretion as to whether it will provide the benefit in the first instance."). This is why the *Ysursa* court left open the possibility for an "as-applied challenge" if a ban on direct political contributions were not enforced "even-handedly." 555 U.S. at 361, 129 S.Ct. 1093. Absent such proof, however, it appears "the State need only demonstrate a rational basis to justify the ban on political payroll deductions." *Ysursa,* 555 U.S. at 359, 129 S.Ct. 1093 (citing *Regan,* 461 U.S. at 546–51, 103 S.Ct. 1997).

### C. Governmental Interest in Selectively Subsidizing Public Unions

 In defending against plaintiffs' First Amendment challenge, defendants exclusively argue that the prohibition on the withholding of union dues from paychecks of general employees does not implicate the First Amendment. Having rejected defendants' position, the court now must determine whether the State of Wisconsin has demonstrated "a rational basis to justify the ban on ... payroll deductions" and, if so, whether plaintiffs have advanced evidence of invidious viewpoint discrimination.

Given its position that none is required, the State proffered *no* justification for the ban on dues deductions from paychecks.[17]

automatic dues deductions for dissenting members of public safety unions, it now prohibits government entities from offering the same subsidy to those individuals who *chose* to continue to belong to general employee unions, despite those unions no longer being able to require union or agency dues from employees who chose not to belong.

**17.** In press releases and public addresses, the Governor claimed that Act 10 was needed to balance the state budget and give state and municipal governments the tools to manage during economic crisis. There is nothing in the record to suggest prohibiting dues withholding for some, but not all, public sector employees provides an administrative sav-

ings. *Cf. City of Charlotte,* 426 U.S. at 286–87, 96 S.Ct. 2036 (finding rational basis review met where city argued and submitted evidence that "allowing withholding only when it benefits all city or departmental employees is a legitimate method for avoiding the burden of withholding money for all persons or organizations that request a check-off"). Nor have defendants described how this particular provision affords state and municipal governments increased flexibility to manage the economic crisis, except perhaps to suppress disfavored unions from opposing certain governmental cuts—a purpose that cannot justify the government's selectively subsidizing union speech. Indeed, the only justification in the record for prohibiting dues

One might turn to the justification already discussed in the Equal Protection context—that extending the ban further would result in protests from public safety unions—but that plays even less well in the First Amendment context, which typically would require the government to proffer a reason justifying its decision *not* to extend the same subsidy to the disfavored speaker. Absent evidence of viewpoint discrimination, perhaps it is enough that the State of Wisconsin merely chose a dividing line between two classes of unions and applied it evenhandedly, but the court has difficulty with that result where the only apparent reason for discriminating between the entities *is* their different viewpoints. Indeed, the very reason proffered by the Supreme Court in *Ysursa* for not interfering in an outright ban on all political payroll deductions for public unions—the State's interest in avoiding the reality or appearance of favoritism or entanglement with partisan politics—is the very reason this court cannot uphold the State of Wisconsin's apparent, if not actual, favoritism and entanglement in partisan politics by discriminating in favor of fundraising efforts on behalf of public safety unions over general employee unions.

## III. Remedy

The court is cognizant that the primary impact of an injunction requiring a return to automatic dues deductions for general employee unions will fall on already burdened local, county and state governmental entities. On the other hand, these unions and their members have been without the benefits of these deductions nine months and are, in this court's view at least, entitled to the same subsidy extended by the State of Wisconsin to other public employee unions and their members.[18] Accordingly, the court will enter an injunction requiring a return to automatic dues deductions for all members of public unions no later than May 31, 2012. This should give sufficient time for the defendants to seek a stay of this injunction from the Seventh Circuit Court of Appeals, and for government entities to adopt a workable procedure to return to automatic deductions should the Seventh Circuit deny a stay, while balancing the plaintiffs' and their now-voluntary members' rights to a return to payroll deductions.

Consistent with the above, the court will also immediately enjoin Act 10's annual, mandatory recertification of general employee unions by an absolute majority of their members.

## ORDER

IT IS ORDERED that:

1) Kristi Lacroix's, Nathan Berish's and Ricardo Cruz's motion to intervene (dkt. # 56) is DENIED;

2) Wisconsin Law Enforcement Association's, Tracy A. Fuller's, Jill A. Buzick's and Kathryn M. Rozmarynoski's

---

withholding for general employees *is* limiting the speech of that class of unions. During the intense debate over Act 10, Senate Majority Leader Scott Fitzgerald commented that "[i]f we win this battle, and the money is not there under the auspices of the unions, certainly what you're going to find is President Obama is going to have a ... much more difficult time getting elected and winning the state of Wisconsin." (Hawks Aff., Ex. L (dkt. # 15–12).) The suppression of free speech, however, is not a valid government interest. *Turner Broad. Sys., Inc. v. Fed. Communications*

*Comm'n*, 520 U.S. 180, 189, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) ("A content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests *unrelated to the suppression of free speech* and does not burden substantially more speech than necessary to further those interests." (emphasis added)).

**18.** Of course, the state could change its law to prohibit withholding for all unions, but that is not within the purview of this court.

motion to intervene (dkt. # 63) is DENIED;

3) Kristi Lacroix's motion to file an amicus brief (dkt. # 45) is GRANTED;

4) Lacroix's Berish's and Cruz's motion to file an amicus brief (dkt. # 91) is GRANTED;

5) James Holmes' motion to file an amicus brief (dkt. # 67) is DENIED;

6) Landmark Legal Foundation's and United States Justice Foundation's motions to file amicus briefs (dkt. ## 98, 102) are DENIED;

7) defendants' motion to withdraw the affidavit of Cynthia Archer and to file an amended response to plaintiffs' preliminary injunction motion (dkt. # 80) is GRANTED IN PART AND DENIED IN PART; defendants' request to withdraw Archer's affidavit is GRANTED although the court will consider it to the extent relied upon by plaintiffs; defendants' request to file an amended response is DENIED; and defendants' request to bar all future discovery on the information in Archer's affidavit is GRANTED;

8) plaintiffs' motions for oral argument (dkt. ## 12, 24, 105) are DENIED.;

9) plaintiffs' motion to file a brief in reply (dkt. # 48) is GRANTED;

10) plaintiffs' motion for temporary restraining order (dkt. # 11) is DENIED AS MOOT;

11) defendants' motion for judgment on the pleadings (dkt. # 75) is GRANTED as to plaintiffs' Equal Protection challenge to Act 10's restrictions on collective bargaining of general employees and their unions and DENIED in all other respects;

12) plaintiffs' motion for summary judgment (dkt. # 88) is GRANTED as to their Equal Protection challenge to Act 10's annual recertification requirement for general employees unions and their First Amendment challenge as to Act 10's prohibition of dues withholding for general employees and DENIED in all other respects;

13) Sections 227, 242, 289, 298, 9132 and 9155 of 2011 Wis. Act 10 are declared null and void;

14) defendants are enjoined from enforcing Wis. Act 10's recertification requirements for general employees unions;

15) defendants are enjoined from prohibiting deductions for general employee unions and directed to facilitate voluntary deductions on or before May 31, 2012; and

16) the clerk of the court enter judgment consistent with this order and close this case.