HAMILTON, Circuit Judge,
concurring in the judgment in part and dissenting in part.
Elections have consequences, as this case reminds us. Although the rationales offered for the State’s different treatment of collective bargaining for “public safety” employees and “general” employees seem flimsy to me, the highly deferential rational-basis review requires that we uphold the principal provisions of Wisconsin’s Act 10 against equal protection challenges. This is particularly true where the federal Constitution would not prevent the State from removing all collective bargaining rights of public employees. I therefore join the portion of the judgment upholding the new statutory limits on the subject matters of collective bargaining for the general em *660 ployees. For essentially the same reasons, I also concur in the portion of the judgment upholding the unprecedented recerti-fication provisions for unions representing “general” employees, although the reasons for those provisions were not presented to the district court. For the reasons explained in Part II-C of the majority’s opinion, I also concur with the affirmance of the district court’s denial of the motion to intervene.
I respectfully dissent, however, from the portion of the court’s decision upholding Wisconsin’s selective prohibition on payroll deductions for dues for some public employee unions but not others. The district court correctly held that the new law’s selective prohibition on payroll deductions violates the First Amendment rights of the plaintiff unions and their members. It is well established that a government employer creates what First Amendment doctrine calls a “nonpublic forum” when it establishes a system for employee payroll deductions for payment to various third parties, including labor unions. It is equally well established under the First Amendment that the public employer may not engage in political or viewpoint discrimination when choosing which payroll deductions are allowed. After close examination of the relevant evidence, the district court correctly found that Wisconsin’s new law amounts to unconstitutional viewpoint discrimination. The majority attempts to avoid this result by portraying the new law as merely denying plaintiffs a “subsidy” for speech. As explained below, that approach fails to come to grips with the applicable First Amendment doctrine and precedents, as well as the evidence showing viewpoint discrimination in the new and selective prohibition.
Part I-A of this opinion summarizes the established First Amendment framework for nonpublic forum analysis and its application to the union dues withholding provisions. Part I-B addresses the requirement of viewpoint neutrality and shows that we cannot end our analysis when we find merely facial neutrality. Part I-C then reviews the evidence showing that the selective limits on payroll deductions here violate the First Amendment. Finally, Part II explains my reasons for concurring in the judgment upholding the annual re-certification provisions.
I. The Discriminatory Limits on Payroll Deductions of Union Dues
A. Payroll Deductions as a “Nonpublic Forum ”
On the payroll deduction issue, let’s start with the common ground. My colleagues and I agree, as all the parties in the case do, that the federal Constitution does not require the State to “subsidize” the plaintiff unions by continuing to provide payroll deductions for union dues. The majority’s emphasis on this uncontroversial point misses the real point of the plaintiffs’ First Amendment claim. See ante at 645-48. Wisconsin has chosen to create such a system of payroll deductions. The new law keeps that system in place for “public safety” employees and their unions but denies access to that same system for all other public employees and their unions. It’s that discrimination that causes the problem here.
The most relevant corner of First Amendment doctrine here is the law applicable to a “nonpublic forum.” When a government is not required to open its property for expressive or communicative purposes, but chooses to do so for limited purposes, it has created a nonpublic forum. The general First Amendment standards for a nonpublic forum are settled: “Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose *661 served' by the forum and are viewpoint neutral.” Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), quoted in Lamb’s Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 392-93, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).
As the term suggests, the nonpublic forum may be a literal forum, such as a place where the government provides shelter, heat, light, and security, such as meeting space in a public school in Lamb’s Chapel. See also, e.g., Grossbaum v. Indianapolis-Marion County Bldg. Auth., 63 F.3d 581, 586 (7th Cir.1995) (public building lobby was nonpublic forum for holiday seasonal displays). First Amendment precedents also make clear, though, that a nonpublic forum may be less literal, such as a charitable campaign where the government provides an audience and subsidizes both communications and even payroll deductions. In fact, Lamb’s Chapel, which involved a literal forum, followed Cornelius. That case held that the Combined Federal Campaign, which solicits charitable donations from federal employees through payroll deductions, is a nonpublic forum. 473 U.S. at 805-06, 105 S.Ct. 3439. Accord, e.g., Davenport v. Washington Educ. Ass’n, 551 U.S. 177, 188-89, 127 S.Ct. 2372, 168 L.Ed.2d 71 (2007) (applying nonpublic forum requirements of viewpoint neutrality and reasonableness to public employee union dues withholding system); Pilsen Neighbors Community Council v. Netsch, 960 F.2d 676, 685-86 (7th Cir.1992) (state program for charitable gifts by payroll deduction was a nonpublic forum). See also Rosenberger v. Rector and Visitors of Univ. of Virginia, 515 U.S. 819, 830, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (state university’s fund for student organizations was nonpublic forum); Choose Life Illinois Inc. v. White, 547 F.3d 853, 865 (7th Cir.2008) (specialty license plates were nonpublic forum); Christian Legal Society v. Walker, 453 F.3d 853, 865-66 (7th Cir.2006) (following Rosenberger, applying nonpublic forum analysis to state university fund for student organization).
The majority opinion proceeds as if there were an important difference between the “nonpublic forum” cases, such as Cornelius, Davenport, and Rosenberger, on one hand, and the “subsidy” line of cases. See ante at 645-48, citing Regan v. Taxation with Representation of Washington, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (“subsidy” case); Ysursa v. Pocatello Educ. Ass’n, 555 U.S. 353, 129 S.Ct. 1093, 172 L.Ed.2d 770 (2009) (another “subsidy” case); and Rosenberger (a “nonpublic forum” case). There is no important difference. What is a nonpublic forum if not a subsidy? The government is not required to provide any subsidy. Nor is it required to provide the forum, but if it does, there is likely to be some form of at least indirect subsidy, whether in the form of light and heat for a literal forum or modest administrative costs for payroll deductions. Regardless of the preferred label, the essential requirements are the same: a generous standard of reasonableness but a prohibition on viewpoint discrimination, as the majority itself acknowledges. Ante at 648.
B. Nonpublic Forums Require Genuine Viewpoint Neutrality
So we have a nonpublic forum, which means that the State’s selective limits on payroll dues deductions must satisfy the First Amendment requirements for a nonpublic forum, including viewpoint neutrality. As Cornelius, Lamb’s Chapel, Rosen-berger, and many other cases show, “[sjpeech restrictions in a nonpublic forum must not discriminate on the basis of viewpoint.” Christian Legal Society v. Walker, 453 F.3d 853, 865 (7th Cir.2006).
The requirement of viewpoint neutrality in handling public employees’ payroll de *662 ductions for union dues should not be controversial. Suppose, for example, that a state set up a system allowing payroll deductions for employees’ political contributions to the state Democratic Party but not to any other party. We can all agree that such a system would violate the First Amendment. And that would be true even though the state might argue that it was not required to “subsidize” the Republican Party or others. A step closer to this case, suppose a state set up a system allowing payroll deductions of dues for unions that supported the Democratic Party but not for unions with a different political bent. Just as surely that system would also violate the First Amendment, again despite the fact that the state would not be required to provide such a subsidy or service for any unions.
Thus, whether the State is understood to be providing benefits or subsidizing speech, the First Amendment governs the State’s decisions that limit access to nonpublic forums and prohibits granting or denying access based on the differing viewpoints of particular groups. “These principles provide the framework forbidding the State to exercise viewpoint discrimination, even when the limited public forum is one of its own creation.” Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510 (“Once it has opened a limited forum, however, the State must respect the lawful boundaries it has itself set.”); see also Elena Kagan, The Changing Face of First Amendment Neutrality: R.A.V. v. St. Paul, Rust v. Sullivan and the Problem of Content-Based Underinclusion, 1992 Sup. Ct. Rev. 29, 43 (1996) (“The government may not use its broad discretion over the property it owns to advantage some viewpoints at the expense of others.... ’’X[1]
As the majority points out, on its face, Wisconsin’s Act 10 seems viewpoint-neutral: public safety unions can have dues withheld from paychecks, while other public employee unions cannot. Facial neutrality, however, is not the end of the matter. The real question here is whether the new law violates—in fact—the well-established requirement of viewpoint neutrality. “Distinguishing between a permissible content-based restriction and an impermissible viewpoint-based restriction is not always easy.” Choose Life Illinois, Inc. v. White, 547 F.3d 853, 865 (7th Cir. 2008).
The Supreme Court has made clear that consideration of viewpoint neutrality or bias does not end with a superficial look at the face of the state’s policy. In Cornelius, for example, the federal government argued that its exclusion of advocacy groups from the Combined Federal Campaign charity drive was a viewpoint-neutral rule designed to avoid disruption of federal workplaces and ensure the success of the campaign. The Supreme Court described those as “facially neutral and valid justifications” for the rule, 473 U.S. at 812, 105 S.Ct. 3439, but that was not the end of the ease. The Court also noted that other evidence cast doubt on the genuineness of the stated concerns, such as the inclusion of other groups in the campaign that did not seem to fit the stated criteria. There was no requirement that rules limiting access to a nonpublic forum be “precisely tailored,” but evidence of a lack of fit between the stated rules and the actual practice gave the Court enough pause to order a remand to pursue the issue of viewpoint neutrality or bias: “While we accept the validity and reasonableness of the justifications offered by petitioner for *663 excluding advocacy groups from the CFC, those justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view.” Id. at 812-13, 105 S.Ct. 3439, citing Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 634, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980).
Despite the majority’s disclaimer in its footnote 7, this passage in Cornelius not only encourages but actually directs lower courts to consider claims that an invidious, viewpoint-biased motive lies behind a facially neutral restriction on access to a nonpublic forum. See also Southworth v. Board of Regents of Univ. of Wisconsin System, 307 F.3d 566, 594 (7th Cir.2002) (finding that facially neutral classifications actually favored non-political organizations thereby resulting in viewpoint discrimination); Pilsen Neighbors Community Council v. Netsch, 960 F.2d at 686-88 (finding no First Amendment violation with Illinois’s system for charitable payroll deductions where criteria were viewpoint-neutral both facially and as applied).
This requirement of genuine viewpoint neutrality, both facially and as applied, is entirely consistent with the Supreme Court’s decision in Ysursa v. Pocatello Education Ass’n, 555 U.S. 353, 129 S.Ct. 1093, 172 L.Ed.2d 770 (2009), upon which the majority relies so heavily. The issue the Supreme Court faced in Ysursa was whether the state of Idaho could prohibit local governments from taking payroll deductions for any political activities, defined broadly enough to include contributions to unions’ political action committees. The Court upheld the state law, reasoning primarily that the prohibition was evenhanded and served the state’s legitimate purpose of avoiding the reality or appearance of government favoritism or entanglement with partisan politics. 555 U.S. at 360, 129 S.Ct. 1093.
Separate opinions by Justices Stevens, Souter, and Breyer questioned whether the prohibition was in fact evenhanded and viewpoint-neutral. The Court addressed their concern in a lengthy footnote. First, the Court explained that the plaintiffs had not tried to establish viewpoint discrimination in the lower courts. The Court then, in a comment directly applicable to this case, added that if the prohibition were not enforced evenhandedly in the future, “plaintiffs are free to bring an as-applied challenge.” Id. at 361 n. 3, 129 S.Ct. 1093, citing National Endowment for the Arts v. Finley, 524 U.S. 569, 587, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (“even in the provision of subsidies, the Government may not ‘ai[m] at the suppression of dangerous ideas’ ”), quoting in turn Regan v. Taxation with Representation of Washington, 461 U.S. at 550, 103 S.Ct. 1997.
In other words, Ysursa applied First Amendment doctrine to uphold a broad ban on payroll deductions for union dues that did not discriminate on the basis of viewpoint. That much is common ground in this case. But on the contested issue in this case, the more important point is that Ysursa reinforced the established law that viewpoint discrimination in a government’s limits on access to a payroll deduction system can violate the First Amendment. 555 U.S. at 361 n. 3, 129 S.Ct. 1093. This remains true whether one prefers to speak in terms of a subsidy or a nonpublic forum. Ysursa simply did not decide an issue like the one we face here, whether Act 10’s facially neutral but selective limits on access to public payroll deductions are actually viewpoint-neutral or not.[2]
*664 C. The Wisconsin Law and Viewpoint Discrimination
Following the teaching of Cornelius and the other cases discussed above, I turn now to Wisconsin’s Act 10 and the actual effects of the restrictions on access to payroll deductions, taking the unions’ evidence and the State’s explanations in turn. Despite the superficial, facial neutrality as to viewpoint, the plaintiffs offered persuasive evidence that the different treatment of “public safety” unions and “general employee” unions is in reality an unconstitutional exercise in viewpoint discrimination. The majority asks the right question but then averts its eyes from the evidence needed to answer it, saying that plaintiffs’ arguments “require peering past the text of the statute to infer some invidious legislative intention. We decline this invitation.” Ante at 649-50.
“Peering past the text” is exactly what we are supposed to do here. “The existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination.” Cornelius, 473 U.S. at 811, 105 S.Ct. 3439. That’s what the Supreme Court taught in Cornelius, as well as Ysursa, and Lamb’s Chapel. Let’s turn to that evidence.[3]
1. Plaintiffs’ Evidence of Viewpoint Discrimination
Consistent with the Supreme Court’s teachings, the plaintiffs rely on three points that together show the State’s proffered rationale is a pretext for viewpoint (here, political) discrimination. The first is the close correlation between various unions’ political endorsements in the 2010 Wisconsin governor’s race and their ability to continue payroll deductions. The second is the flimsiness of the State’s proffered rationales for drawing the line as it did between public safety and general employees and for barring payroll deductions of union dues for all but public safety employees. The third is the overtly partisan political explanation for the Act that was offered in the legislative debate.
*665 a. Political Endorsements of the Affected Unions
Five unions representing public sector employees endorsed then-candidate Walker for governor during the 2010 campaign: the Wisconsin Troopers Association, whose members are state troopers and motor vehicle inspectors; the Milwaukee Police Association; the Milwaukee Professional Fire Fighters Association; the West Allis Professional Police Association; and the Wisconsin Sheriffs and Deputy Sheriffs Association Political Action Committee. The members of all five organizations are included in the new law’s “public safety” classification. They all retained their full collective bargaining rights, including payroll deductions for union dues and fair share payments.
The net effect is that all public employees represented by unions that endorsed Governor Walker continue to enjoy collective bargaining, and those unions continue to benefit from payroll deductions. On the other hand, nearly all members of the public employee unions that did not endorse Governor Walker are categorized as “general” employees. Their bargaining rights have been reduced to a hollow shell and payroll deductions are not available for their union dues. The correlation is admittedly not perfect—-some other local police and fire unions did not endorse Governor Walker but are “public safety” employees—but it’s very strong. As the district court noted, the “fact that none of the public employer unions falling into the general category endorsed Walker in the 2010 election and that all of the unions that endorsed Walker fall within the public safety category certainly suggests that unions representing general employees have different viewpoints than those of the unions representing public safety employees.” Wisconsin Educ. Ass’n Council v. Walker, 824 F.Supp.2d 856, 873 (W.D.Wis. 2012).
b. The State’s Explanations
Of course, the correlation between political allegiance to the governor and continued access to payroll deductions could be just a coincidence, a result of a reasonable policy decision to treat public safety employees differently than other public employees. Legislation is not unconstitutional just because it favors political supporters or harms opponents. See Hearne v. Board of Educ. of City of Chicago, 185 F.3d 770, 775 (7th Cir.1999).
The State argues that public safety employees were treated more generously because they were in a position to strike (albeit illegally) and thereby to undermine public safety.
A closer look undermines that explanation. The state employs many police officers, firefighters, and others with important public safety responsibilities who are excluded from the “public safety” classification of Act 10. If the State’s proffered explanation for treating “public safety” employees differently were actually true, it would be hard to understand why that explanation would not apply as well to police officers at the University of Wisconsin, Capitol Police officers, the State’s thousands of correctional and probation officers, and many others with important public safety duties. Instead, those employees, whose unions did not endorse Governor Walker, are treated as general employees, and their unions do not benefit from payroll deductions.
As the district court explained, one particular gerrymander of the legislative classifications illustrates the problem well. The Wisconsin Law Enforcement Association (WLEA) has been the collective bargaining representative for state troopers, other employees of the Wisconsin State Patrol, and many other law enforcement personnel who work for the state, including the Capitol Police and the University *666 of Wisconsin Campus Police. Within the WLEA, only the Wisconsin Troopers Association (WTA), which is the lobbying group for employees of the Wisconsin State Patrol, endorsed Governor Walker in the 2010 campaign. The WTA includes both state troopers and state motor vehicle inspectors. The new law was drawn up to treat all WTA members—motor vehicle inspectors as well as state troopers—as favored “public safety” employees. But the law treats all other groups within the WLEA, and recall that it is the Wisconsin Law Enforcement Association, including the Capitol and University of Wisconsin Police, as only “general” employees.
Perhaps a strike by motor vehicle inspectors might threaten the breakdown of public order and state government, but it’s hard to see how. It’s especially hard to see how the threat of a strike by motor vehicle inspectors could reasonably be deemed more significant than a strike by, say, correctional officers or many other law enforcement officers excluded by the new law. The district court recognized this as well, noting that in the context of the dues withholding provision and annual recertification requirements, “the relationship between the interest of avoiding strikes and these other challenged provisions is substantially more tenuous.” Wisconsin Educ. Ass’n Council v. Walker, 824 F.Supp.2d at 868. In the context of employment discrimination law, such an implausible explanation is treated as a pretext, which allows a reasonable inference of unlawful discrimination. E.g., Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). That’s what we have here, too.
The State’s and majority’s reasoning is even harder to understand when we consider the State’s own analysis governing the classifications. The Deputy Secretary of the Wisconsin Department of Administration assisted in developing and analyzing Act 10 and explained the line-drawing process in an affidavit. She was in part responsible for “planning for contingencies arising from the enactment of Act 10 including potential job actions and strikes.” As part of this analysis, she assessed which departments provided “critical state services,” the interruption of which would threaten public safety. The assessment concluded that the Department of Corrections and its staff were crucial. It further found that even with the National Guard’s standing plan to replace the Department of Corrections if necessary, “there were insufficient State resources” to “fulfill the backfill staffing requirements to ensure the continuation of critical services in the event of a mass job action.” SuppApp. at 130-32.[4] Despite these findings, the prison guards, who the record shows are crucial to public safety and have a history of striking, were classified as “general” employees and not as “public safety” employees. Their union did not support Governor Walker in the election.
The internal analysis also “identified a probable gap in staffing for state building and staff security in the event of large scale protests.” Id. at 132. Yet the Capitol Police were also categorized as “general employees” deemed not critical to public safety in the event of a mass action. That mass action did in fact occur on the steps of the very Capitol that, after the passing of Act 10, risked being understaffed in the event of a strike in response to Act 10.
I recognize, of course, that when governing access to a nonpublic forum, the State *667 is not required to draw these lines perfectly, see Cornelius, 473 U.S. at 808-09, 105 S.Ct. 3439, but this internal analysis clearly undermines the viewpoint-neutral justifications offered by the State. As Justice Kagan has written, “the looser the fit between the interest asserted and the contours of the law, the greater the cause for suspicion. At a certain point—when the asserted interest is insubstantial or when it does not fit the scope of the challenged regulation—-the usual presumption of proper purpose topples; there is reason, then, to think that the law, though content neutral, has been tainted by impermissible purpose.” Elena Kagan, Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine, 63 U. Chi. L.Rev. 413, 455 (1996). The State has reached that point with the selective payroll deduction provisions of Act 10.
The State also argues more specifically that the selective prohibition on payroll deductions for union dues serves the purpose of “favoring employee choice.” This explanation is so specious that it only adds further support for the district court’s conclusion that the State’s explanations are pretexts. Under Act 10, general employees cannot be required to pay union dues or fair share payments. Even if payroll deductions were still available, they would be available only from those union members who voluntarily chose to pay dues in that way. Denying those employees the ability to make voluntary payments through payroll deductions does not even arguably promote “employee choice” for those employees.
By comparison, the State is continuing the practice of payroll deductions for the favored public safety unions that supported Governor Walker. Those unions are still entitled to require payment of union dues or fair share payments from all members of the bargaining unit. The continued payroll deductions for those unions therefore include entirely involuntary payments by employees who are not union members and who object to the payments and payroll deductions. If “employee choice” were actually the favored policy, the State’s selective decision to prohibit voluntary payroll deductions for the benefit of some unions while still enforcing involuntary payroll deductions for the favored unions is difficult to understand.
c. Legislative Debate
In the district court the State relied solely on an argument that the First Amendment simply did not apply to its decisions about payroll deductions. That defense was mistaken for reasons already explained. In considering the payroll deduction provisions, the district court noted “the only justification in the record for prohibiting dues withholding for general employees is limiting the speech of that class of unions. During the intense legislative debate on what became Act 10, Senate Majority Leader Scott Fitzgerald commented that ‘[i]f we win this battle, and the money is not there under the auspices of the unions, certainly what you’re going to find is that President Obama is going to have a ... much more difficult time getting elected and winning the state of Wisconsin.’ ” Wisconsin Educ. Ass’n Council v. Walker, 824 F.Supp.2d at 875-76 n. 17 (ellipsis in original).
Helping one side win elections is certainly a rational reason for the payroll deduction limits, and the limits were designed well to serve that purpose. But under the First Amendment, of course, it’s not a permissible reason for restricting access to the nonpublic forum of payroll deductions. It’s transparent viewpoint discrimination. So the State and the majority need to sweep the majority leader’s candid statement under a rug.
*668 The argument against relying on the majority leader’s statement is the familiar one about legislative motive exemplified by United States v. O’Brien, where the Supreme Court upheld a law making it a federal crime to burn a draft card: “Inquiries into congressional motives or purposes are a hazardous matter.... What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a ‘wiser’ speech about it.” 391 U.S. 367, 383-84, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).
As a general rule, the O’Brien point is certainly correct, and if the majority leader’s speech were the only evidence of viewpoint discrimination, it would be difficult to find a First Amendment violation based solely on that one speech. But neither O’Brien nor many other Supreme Court decisions require that we wear blinders to block our view of reality when we examine a serious claim that the legislature chose to engage in unconstitutional viewpoint discrimination, especially when that evidence of legislative purpose corroborates other, more familiar and comfortable forms of evidence. “In short, the relevance of motive to constitutional adjudication varies by context. No automatic cause of action exists whenever allegations of unconstitutional intent can be made, but courts will investigate motive when precedent, text, and prudential considerations suggest it necessary in order to give full effect to the constitutional provision at issue.” Grossbaum v. Indianapolis-Marion County Bldg. Auth., 100 F.3d 1287, 1294 (7th Cir.1996). “Motive may thus be a vital piece of evidence that courts must use to judge the viewpoint-neutrality of the regulation.” Id. at 1298; see also Elena Kagan, Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine, 63 U. Chi. L.Rev. at 442 (reading O’Brien to stand for “a narrower proposition, relating not to the propriety of inquiring into motive, but to the means by which to conduct this inquiry”).
The evidence of unconstitutional legislative purpose here is similar to evidence of legislative purpose the Supreme Court has relied upon in other cases, such as Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), which struck down a state law authorizing a daily moment of prayer or meditation in public schools. The sponsor testified after the enactment that his purpose was to “return voluntary prayer to our public schools.” Id. at 43, 105 S.Ct. 2479. The sponsor’s statement was relevant and probative, at least where it corroborated other evidence indicating an unconstitutional motive. Id. at 57, 105 S.Ct. 2479 (Stevens, J.), and 65 (Powell, J., concurring). The same is true of evidence of motive in Edwards v. Aguillard, 482 U.S. 578, 586-87, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (relying in part on legislative sponsor’s statements about purpose to strike down law requiring teaching of creationism), and Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265-66, 268, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (considering evidence of legislators’ racial motives as part of larger set of evidence regarding reasons for refusal to rezone property to allow multiple-family housing). Cf. Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 49 n. 9, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (finding no viewpoint discrimination in nonpublic forum, in part, because “there is no indication in the record that the policy was motivated by a desire to suppress the PLEA’s views”). See also John Hart Ely, Legislative & Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205, 1279 (1970) *669 (arguing that O’Brien does not eliminate motive’s “proper role of triggering demands for legitimate defense which would not otherwise attach”). The district court did not err by taking into account the majority leader’s overtly partisan explanation for the different treatment of the different unions, and that evidence should not be ignored here.
2. The State’s Additional Justifications
For the first time on appeal, the State has advanced three additional reasons for the selective prohibition on payroll deductions for union dues. The State contends that it no longer has any interest in securing the stability and continuity of “general employee” unions because they no longer have meaningful collective bargaining rights. Therefore, the State argues, it cannot justify the additional expenditure or alleged increased exposure to liability of withholding dues for “general employees.” These additional justifications all center on the argument that, as the State puts it in its reply brief, “public safety” unions after Act 10 have a “fundamentally different relationship with the State and municipal employers than other employee organizations” by dint of their full collective bargaining rights. State Reply Br. 40. From this premise, the State argues, it is reasonable for it to create a nonpublic forum to “assist those employee organizations whose members have full collective bargaining privileges in the collection of their dues.” State Reply Br. 33. This argument was waived in the district court; even on its merits it is merely circular.
On the waiver point, in the district court, the State’s only response to plaintiffs’ First Amendment challenge to the payroll deduction provision was an argument that the First Amendment simply did not apply. Wisconsin Educ. Ass’n Council v. Walker, 824 F.Supp.2d at 875 (“In defending against plaintiffs’ First Amendment challenge, defendants exclusively argue that the prohibition on the withholding of union dues from paychecks of general employees does not implicate the First Amendment.”). That position was obviously mistaken; my colleagues and I agree to that extent, at least. As a result, the State’s entire defense on appeal was a creation solely for the appeal. The State’s handling of the issue amounts to a waiver of other theories of defense. See, e.g., Fednav Int’l Ltd. v. Continental Ins. Co., 624 F.3d 834, 841 (7th Cir.2010) (“[A] party has waived the ability to make a specific argument for the first time on appeal when the party failed to present that specific argument to the district court, even though the issue may have been before the district court in more general terms.”); Domka v. Portage County, 523 F.3d 776, 783 (7th Cir.2008) (“[A] party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal.”) (citations omitted).[5]
The majority has chosen, however, to indulge this tactic by allowing the State to prevail based on arguments that were never made to the district judge. I disagree, but even more to the point, the State’s late and ad lib attempt to come up with a viewpoint-neutral defense of the payroll deduction policy is further evidence that the defense is just a pretext for unconstitutional viewpoint discrimination.
*670 On the merits of this new argument, the State cannot avoid investigation into viewpoint discrimination by defining the nonpublic forum as one intended to support a certain viewpoint, even if the definition is framed in a facially neutral way. And yet that is exactly the argument advanced by the State when it explains that, “to the extent the payroll systems are considered nonpublic fora, the purpose of the fora is to facilitate dues deductions for those organizations that serve employees with full collective bargaining privileges.” State Reply Br. 36.[6]
We have previously acknowledged the potential to camouflage impermissible viewpoint discrimination by cloaking it in facially neutral classifications. “Because subject matter discrimination is clearly constitutional in nonpublic fora, classifying a particular viewpoint as a subject rather than as a viewpoint on a subject will justify discrimination against the viewpoint. This inherent manipulability of the line between subject and viewpoint has forced courts to scrutinize carefully any content-based discrimination.” Grossbaum v. Indianapolis-Marion County Bldg. Auth., 100 F.3d at 1298 (citations omitted). The State may not, therefore, pick and choose who may participate in the nonpublic forum based on the speaker’s viewpoint. This protection applies to both the definition of the purpose of the nonpublic forum and to the criteria for eligibility to participate in that forum. We should affirm the district court’s decision striking down the ban on payroll deductions of union dues for “general” public employees.
II. The Annual Recertification Requirement
I concur in the portion of the judgment upholding the annual recertification requirement against the equal protection challenge. It is for me a close question. This provision and its flimsy justifications raise concerns very similar to those regarding the dues withholding provision. In essence, though, rational-basis review under the Equal Protection Clause is much more forgiving than the First Amendment standard for a nonpublic forum. Even so, we should also acknowledge that the basis for reversing this portion of the district court’s judgment consists of arguments the State never presented to the district court. But for the broad deference to legislatures under rational-basis review, I would deem these arguments waived and conclude as the district court did that there was no rational basis for this unprecedented and punitive provision.
The district court applied rational-basis review to the annual recertification provisions. (The district court acknowledged that the provisions might present First Amendment issues similar to the payroll deduction provision. The plaintiffs did not pursue such a theory, though, and I also do not consider it.) Under rational-basis review, the legislature has the “widest possible latitude within the limits of the Constitution.” Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 510, 57 S.Ct. 868, *671 81 L.Ed. 1245 (1937). The plaintiffs have the burden to “negative every conceivable basis which might support” the legislation. Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973) (citations omitted); see also Nordlinger v. Hahn, 505 U.S. 1, 17, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (“Petitioner has not demonstrated that no rational bases lie for either of these exemptions.”).
Rational-basis review creates the odd phenomenon that arguments to justify challenged legislation may be raised for the first time on appeal. Each level of the judiciary is charged with using its imagination to identify any possible legitimate reason for the challenged law. See FCC v. Beach Communications, Inc., 508 U.S. 307, 312, 320, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (reversing circuit court’s finding that law was unconstitutional after identifying “plausible rationales,” and explaining that the “assumptions underlying these rationales may be erroneous, but the very fact that they are ‘arguable’ is sufficient, on rational-basis review, to ‘immunize’ the congressional choice from constitutional challenge”), citing Vance v. Bradley, 440 U.S. 93, 112, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); see also Board of Trustees of Univ. of Alabama v. Garrett, 531 U.S. 356, 367, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (“Moreover, the State need not articulate its reasoning at the moment a particular decision is made. Rather, the burden is upon the challenging party to negative ‘any reasonably conceivable state of facts that could provide a rational basis for the classification.’ ”) (citations omitted).
All of this is to say simply that rational-basis review is one of those unusual alcoves in the law where we overlook a party’s failure to present its case to the district court. Given this leniency afforded to the State, I concur with the result on this issue, noting that the district court itself, recognized this would be the appropriate disposition “but for,” in its words, “defendants’ failure to articulate and this court’s inability to posit, how an annual, absolute majority vote by a wholly-voluntary union could rationally advance a reasonable purpose.” Wisconsin Educ. Ass’n Council v. Walker, 824 F.Supp.2d at 869.
I also agree with the district court’s observation that requiring a majority of all eligible voters is nearly unprecedented and seems irrational, at least if one assumes for purposes of argument that the law was not intended to be part of a political reward for supporters and punishment for opponents. Id. at 869. To understand this, suppose we applied the same approach to elections for presidents or governors: assume that all eligible voters who do not vote should be counted as “no” votes or “none of the above” votes. The votes for “no” or “none of the above” would win virtually every election.[7] Even in the most lopsided presidential elections of the past century, the number of eligible nonvoters exceeded the winner’s popular vote.[8] The same is true of Wisconsin gu *672 bernatorial elections.[9]
It is far from clear why completely voluntary unions with minimal bargaining rights could need annual recertification under voting rules that would undermine our nation’s democracy if applied to government elections. As legitimate bases for the annual recertification provisions for unions representing general employees, the State argues that they will promote employee choice and that, because the rest of Act 10 has weakened the powers of these unions so much, the State simply has little to no interest in providing for stability in union representation of these employees. By contrast, because public safety employee unions retain their traditional powers, the State says, it has a substantially greater interest in stable representation so that it can negotiate and work with familiar counterparts. Under rational-basis review, “a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.” FCC v. Beach Communications, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). That’s about the most that can be said in favor of the annual recertification requirement, other than as punishment of political opponents.[10]
* * *
As I said at the outset, elections have consequences. The United States Constitution does not forbid all legislation that rewards friends and punishes opponents. The principal provisions of Wisconsin’s Act 10 may fit that description, but they are *673 still constitutional under the generous standard of rational-basis review. The new, selective limits on payroll deductions for union dues, however, are subject to the more demanding First Amendment standards for a nonpublic forum and flunk that test. I would affirm that portion of the district court’s judgment.

. The Supreme Court used the term "limited” public forum in Rosenberger to describe what is more commonly called a "nonpublic” forum, as shown in Rosenberger’s discussion of Cornelius and Lamb's Chapel. See 515 U.S. at 829, 115 S.Ct. 2510.

. Toledo Area AFL-CIO Council v. Pizza, a case cited by the majority as a "subsidy” case, recognized this important difference. In upholding a ban on wage checkoffs, the Sixth Circuit said it was "significant” that the prohibition was universal in its application: "The provision does not single out political contri *664 butions to only certain parties, candidates or issues. All Ohio public employees are denied the benefits that might be derived from such publicly-administered programs, regardless of the content of their political views or their party affiliation.” 154 F.3d 307, 319 (6th Cir.1998). The same cannot be said in this case.

. To defend its decision not to inquire into the possibility of viewpoint discrimination beyond the face of the statute, the majority relies on inapposite "time, place, and manner” cases, observing that disparate impact on one viewpoint does not "transform a facially neutral statute into a discriminatory one.” Ante at 650, citing Hill v. Colorado, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000), and Madsen v. Women's Health Center, Inc., 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). The "time, place, and manner” doctrine does not justify a refusal to consider genuine evidence of viewpoint bias in access to a nonpublic forum. Time, place, and manner restrictions must be content neutral and narrowly tailored to serve a significant government interest, and must leave ample álternative channels of communication. Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). In effect, such laws restrict particular conduct, as in Hill, which regulated speech within eight feet of another person without that person’s consent. 530 U.S. at 707, 120 S.Ct. 2480. This is not the case in which to explore all the First Amendment doctrinal nuances, but these other requirements make viewpoint discrimination more difficult to achieve with time, place, and manner restrictions. The Supreme Court itself has distinguished the two lines of doctrine. See Madsen, 512 U.S. at 763-64, 114 S.Ct. 2516 ("the injunction issued in this case does not demand the level of heightened scrutiny set forth in Perry Ed. Ass’n, 460 U.S. at 45, 103 S.Ct. 948,” which was a nonpublic forum case). We should follow the nonpublic forum cases and consider the evidence showing that a facially neutral statute in fact is being used to limit access to an important nonpublic forum based on political viewpoint.

. To avoid the deposition of the Deputy Secretary, the State moved to withdraw this affidavit in the district court. Plaintiffs did not oppose this withdrawal and the district court therefore granted the request but reserved the right to rely on it to the extent it was relied upon by plaintiffs. Wisconsin Educ. Ass'n Council v. Walker, 824 F.Supp.2d at 862.

. Plaintiffs did not argue that the State waived these defenses (though they noted that the defenses were asserted for the first time on appeal), but the waiver doctrine is designed for the protection of the court as much as for that of an opposing party, "and therefore need not be asserted by a party for us to invoke it.” United States v. Hassebrock, 663 F.3d 906, 914 (7th Cir.2011) (citations omitted).

. City of Charlotte v. Local 660, Int’l Ass’n of Firefighters upon which the State relies for support that it can pick and choose who participates in its nonpublic forums does not support the corollary point the State hopes it does, namely that the legislature’s choices are wholly immune from judicial review. 426 U.S. 283, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976). The Supreme Court determined that the regulation in question, which allowed only those wage deductions that benefitted all city or municipal employees, was reasonable. The Court focused on the fact that the City had "not drawn its lines in order to exclude individual deductions,” and therefore found this universal ban on all checkoffs for any unions both rational and compatible with the Equal Protection Clause. Id. at 288, 96 S.Ct. 2036.

. Scholars have coined the term “voter eligible population” (VEP), which is a smaller universe than the voting age population (VAP). The VAP includes all people 18 and older who are theoretically able to vote, while the VEP excludes from that number felons, noncitizens, and mentally incompetent individuals, all of whom would be legally barred from voting. For an in-depth explanation of the methodology used to formulate the VEP, see Michael McDonald & Samuel L. Popkin, The Myth of the Vanishing Voter, 95 Am. Pol. Sci. Rev. 963 (2001) [hereinafter Myth of the Vanishing Voter]. Professor McDonald, a leading scholar in the field, has collected some of this data online as well. See United States Elections Project, last visited Jan. 16, 2013, available at http://elections.gmu.edu/ [hereinafter U.S. Elections Project].

. In 1984, for example, approximately 161,-980,000 people were eligible to vote. President Ronald Regan received 54,455,074 votes, *672 which were just 33.6 percent of the VEP. (For the total popular vote, see Congressional Quarterly, Presidential Elections Since 1789 at 132 (4th ed.) [hereinafter Congressional Quarterly], To calculate the total VEP, see Myth of the Vanishing Voter at 966, which reports what percentage of the VEP is constituted by the total popular vote.) In 1964, there were approximately 112,492,000 eligible voters. President Lyndon Johnson received 43,126,584 votes, which were just 38.3 percent of the total VEP. See Congressional Quarterly at 127, and Myth of the Vanishing Voter at 966.

. In the 2010 Wisconsin gubernatorial election, there were approximately 4,170,500 eligible voters. Governor Walker received 1,128,941 votes, which were 27 percent of the VEP. For the 2010 election results, see Wisconsin State Government Accountability Board (GAB), GAB Canvass Reporting System, Dec. 8, 2010, available at http://gab.wi.gov/ sites/default/files/percent% 20results% 20post% 20recount_120710.pdf [hereinafter GAB Data]. For the calculation of the Wisconsin 2010 VEP, see U.S. Elections Project, available at http://elections.gmu.edu/Turnout_ 2010G.html. In the 2006 Wisconsin gubernatorial election, there were approximately 4,064,500 eligible voters. Governor Doyle received 1,139,115 votes, which were 28 percent of the VEP. See U.S. Elections Project, available at http://elections.gmu.edu/ Turnout% 202006Ghtml, and GAB Data, available at http://elections.state.wi.us/ docview.asp?docid=10080&locid=47. In the 2002 Wisconsin gubernatorial election, there were approximately 3,908,000 eligible voters. Governor Doyle received 800,515 votes, which were 20 percent of the VEP. See U.S. Elections Project, available at http://elections. gmu.edu/Turnout_2002Ghtml, and Dave Leip’s Atlas of U.S. Presidential Elections, available at http://uselectionatlas.org/ RESULTS. (All websites last visited Jan. 16, 2013).

. Act 10's overall aim of cost saving does not appear to justify this provision, for the record suggests that annual recertification will actually cost the State money. A letter from the Wisconsin State Employment Relations Commission to the Secretary of the Department of Administration voiced "grave concerns” about the annual recertification provision. Supp.App. at 98. The letter detailed the administrative impossibilities of conducting these annual recertifications on site and the considerable strain this would have on administrative resources given that it was a "labor intensive endeavor." Id. The Commission estimated, based on past experience, that the postage alone would cost the State $176,000 for every 200,000 employees. Id. at 99.